UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
CORINNE HARDHARDT,

                  Plaintiff,

       - against -

MICHAEL J. ASTRUE,[1]
Commissioner of Social Security,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM & ORDER**

05-CV-2229 (DRH)

**A P P E A R A N C E S :**

**CHRISTOPHER JAMES BOWES, ESQ.**
Attorney for Plaintiff
54 Cobblestone Drive
Shoreham, New York 11786

**BENTON J. CAMPBELL**
**UNITED STATES ATTORNEY**
Attorney for Defendant
One Pierrepont Plaza, 14th Floor
Brooklyn, New York 11201
By: Zachary A. Cunha, Assistant U.S. Attorney

**HURLEY, Senior District Judge:**

*INTRODUCTION*

      Plaintiff Corinne Hardardt ("Plaintiff") brings this action pursuant to 42 U.S.C.

§ 405(g) seeking judicial review of a final decision by the Commissioner of Social Security (the

"Commissioner" or "Defendant") which denied her claim for disability benefits.  Presently

before the Court are Plaintiff's and Defendant's motions for judgment on the pleadings pursuant

---

[1]  Plaintiff's Complaint, which was filed on May 6, 2005, named Jo Anne B. Barnhart,
the former Commissioner of Social Security, as the defendant.  On February 12, 2007, Michael J.
Astrue took office as Social Security Commissioner.  He has therefore been substituted as the
main defendant in this matter pursuant to Federal Rule of Civil Procedure 25(d).

to Federal Rule of Civil Procedure 12(c).  For the reasons discussed below, Defendant's motion is denied and Plaintiff's motion is granted to the extent that this matter is remanded for further administrative proceedings.

## BACKGROUND

### I.      Procedural Background

Plaintiff applied for disability benefits on December 12, 2002.  (Tr. at 38.)[2] Plaintiff claimed that she had been disabled since March 1, 2002, due to vestibular disorder, neck pain, right arm and right shoulder pain, anxiety, dizziness, imbalance, sensitivity to noise, and an inability to comprehend written material."  (*Id.* at 38, 49.)

After her application was denied initially (*id.* at 16A, 17-19), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (*Id.* at 20.)  A hearing was held before ALJ Joseph Halpern on November 15, 2004, at which time Plaintiff, who was represented by counsel, testified (*id.* at 211-21), as did Dr. Osvaldo Fulco, a medical expert.  (*Id.* at 217-20.)

ALJ Halpern considered Plaintiff's claims de novo and, on November 30, 2004, issued a decision finding that Plaintiff was not disabled.  (*Id.* at 30-37.)  The ALJ found that although Plaintiff suffered from severe impairments that prevented her from performing her past work, Plaintiff was able to perform a wide range of unskilled sedentary work.  (*Id.* at 33-37.)

Plaintiff requested that the Appeals Council review the ALJ's decision.  (*Id.* at 6-8.)  By letter dated March 17, 2005, the Appeals Council declined to review the claim.  (*Id.* at 3-5.)  Thereafter, Plaintiff timely filed the instant civil action.

---

[2]  References to "Tr." are to the Administrative Record filed in this case.

## II.  Factual Background

### A.  Non-Medical Evidence

Plaintiff was born on June 4, 1957 (*id.* at 38), and completed high school.  (*Id.* at 55.)  She worked as a supervisor for a Long Island law firm from 1977 to March 1, 2002.  (*Id.* at 39, 214.)  She alleges that she was unable to continue working as of March 2002 because of dizziness, inability to sit or bend her head for long periods of time, difficulty concentrating, and an inability to write, see or type properly.  (*Id.* at 49.)  At the hearing, she testified that she has dizzy spells lasting ten to fifteen minutes and occurring at least 5 to 6 times a day.  (*Id.* at 214-16.)  Because of her spells, she has sustained burns and falls.  (*Id.* at 215.)

In her function report, she stated that she can no longer clean her house, ride her bicycle, read for pleasure, socialize in large groups, or cook.  (*Id.* at 69.)  Headaches keep her up for hours at a time during the night.  (*Id.*)  She said that reading gives her headaches and she has to read things more than once in order to comprehend them.  (*Id.* at 72.)  She loses her train of thought and has difficulty paying attention.  (*Id.* at 74.)  She gets very disoriented and stress causes her anxiety.  (*Id.* at 75.)  She has "stabbing pain" in her neck, shoulder, and right arm down to her wrist and fingers daily, which are cold and numb.  (*Id.* at 76.)

### B.  Medical Evidence/Treating Physicians

The medical evidence before the ALJ  is briefly summarized below.

#### 1.  Dr. David Besser - Board Certified Neurologist

Dr. David Besser saw Plaintiff on three occasions in 2002.  (Tr. at 182, 184, 192-93.)  Dr. Besser first examined Plaintiff on May 9, 2002.  (*Id.* at 192-93.)  Plaintiff complained

of vertigo[3] with "blurry or jumping vision" which lasted for one week and then resolved.  (*Id.* at 192.)  She also complained of light sensitivity and increased sensitivity to loud noises.  (*Id.*)  Although her condition resolved significantly, she complained of episodic feelings of imbalance which continued until April 12, 2002.  (*Id.*)  Dr. Besser noted that prior to April 12, 2002, Plaintiff began taking Zoloft which helped her.  (*Id.*)  He also noted that a CT scan of her brain and sinuses showed no significant abnormalities.  (*Id.*)  Dr. Besser diagnosed Plaintiff with possible vestibulopathy[4] and ordered a series of testing to rule out other conditions.  (*Id.* at 193.)

Plaintiff was next examined by Dr. Besser on July 29, 2002.  (*Id.* at 184.) Plaintiff presented with the same complaints but also indicated that she had a "buzziness stemming from her head, especially when she moves her neck to the right or upwards."  (*Id.*)  Dr. Besser noted that a May 2002 MRI of the cervical spine revealed mild congenital spinal stenosis[5] with borderline compression of the spinal cord as well as a disc protrusion at C3-C4.  (*Id.*)  Dr. Besser suspected vestibulopathy with a possible cervical disc disease involvement.  (*Id.*)  He recommended balance therapy and further testing.  (*Id.*)

On November 4, 2002, Plaintiff complained to Dr. Besser of intermittent dizziness, a buzzing feeling in her head, and occasional forgetfulness.  (*Id.* at 182.)  Dr. Besser noted that Plaintiff had been treated by Dr. Allen Cohen, O.D. with prism glasses and therapy for her dizziness, and by Dr. Kevin Mullins, M.D. for neck and shoulder problems.  (*Id.*)  Dr. Besser noted that Plaintiff was alert, coherent, and quite fluent.  (*Id.*)  He diagnosed vestibulopathy and

---

[3]  A sensation of spinning or whirling motion.  *Stedman's Medical Dictionary* 1958 (27th ed. 2000).

[4]  An abnormality of the vestibule of the ear.  *Stedman's* at 1960.

[5]  A circumscribed narrowing of the spinal cord.  *Stedman's* at 1695, 1710.

cervical disc disease.  (*Id.*)  He could not explain her complaints of buzzing in the brain and recommended that she undergo a neurosurgical consultation to address her subjective complaints.  (*Id.*)

### 2.    *Dr. Kevin J. Mullins - Board Certified Neurological Surgeon*

Dr. Kevin J. Mullens, a neurosurgeon, saw Plaintiff on referral from Dr. Besser on four occasions in 2002.  (*Id.* at 100-07.)  Dr. Mullens first examined Plaintiff on June 17, 2002 for her complaints of dizziness and neck and right arm pain.  (*Id.* at 105-06.)  Her dizziness was "recurrent and associated with nausea."  (*Id.* at 105.)  Dr. Mullens noted that carotid doppler studies, an EEG and a CT scan of her brain were normal, although her electronystagmography ("ENG")[6] studies were abnormal and suggested a "positional sensitive right peripheral neuropathy."  (*Id.*)  An MRI revealed a central disc herniation at C6-C7 with moderate spinal stenosis and some milder neural foraminal narrowing on the right side.  (*Id.* at 106.)  Dr. Mullins opined that Plaintiff's neck pain and some of her right arm pain could be related to the disc herniation.  (*Id.*)  However, he stated that it would be difficult to correlate the dizziness and nausea to the cervical problems, which he believed more likely related to an ear disorder.  (*Id.*)  He recommended physical therapy for her neck discomfort and electrodiagnostic studies to evaluate any radiculopathy.[7]  (*Id.*)

Dr. Mullins saw Plaintiff again in July 2002.  (*Id.* at 104.)  Plaintiff again complained of buzzing in her ear and some vertigo for which she was undergoing continued

---

[6] Electronystagmography records voluntary and involuntary eye movements.  It evaluates the acoustic nerve, which aids with hearing and balance. www.nlm.nih.gov/medlineplus/ency/article/003448.htm

[7] Disorder of the spinal nerve roots.  *Stedman's* at 1503.

balance therapy. (*Id.*) Because Plaintiff's EMG studies were incomplete, Dr. Mullens asked Plaintiff to schedule another appointment. (*Id.*)

Dr. Mullins next examined Plaintiff on September 11, 2002. (*Id.* at 102-03.) Plaintiff complained of localized neck discomfort with decreased range in motion. (*Id.* at 102.) Plaintiff denied any dizziness at that time. (*Id.*) Dr. Mullins noted the findings of spondylosis[8] discomfort at C5-6 but reported that in the absence of a severe disc herniation and in light of negative electrodiagnostic studies, Plaintiff was not a candidate for surgery. (*Id.*) He recommended pain management if her neck pain continues. (*Id.*)

In her final examination, on December 11, 2002, Plaintiff complained of localized neck and right shoulder discomfort with decreased range of motion. (*Id.* at 100.) Examination showed good motor strength with symmetric reflexes. (*Id.*) He noted that due to her negative electrodiagnostic studies and intact neurological exam, she was not a candidate for surgery. (*Id.*) However, he did recommend pain management given the "protracted nature of her symptoms." (*Id.*)

### 3. *Dr. Steven A. Rosen - Board Certified Neurologist*

Plaintiff was treated by Dr. Steven A. Rosen twice in 2002 (*id.* at 183, 185-88), twice in 2003 (*id.* at 168, 180-81), and once in 2004 (*id.* at 167). Dr. Rosen first examined Plaintiff in June 2002 and performed several tests which were suggestive of positionally sensitive right peripheral vestibulopathy. (*Id.* at 188.)

On August 5, 2002, Dr. Rosen performed a binocular vision screening study to test for eye muscle dysfunction. (*Id.* at 183.) On the basis of Plaintiff's abnormal binocular

_____

[8] Stiffening of the vertebra. *Stedman's* at 90, 1678.

visual screen, Dr. Rosen recommended a formal oculomotor evaluation.  (*Id.*)

Dr. Rosen next examined Plaintiff on January 23, 2003.  (*Id.* at 180-81.)  Plaintiff reported that she had been asymptomatic until March 2002 when she began to experience dizziness and balance instability which worsened on motion.  (*Id.* at 180.)  Plaintiff expressed frustration over her inability to think clearly and her difficulty multi-tasking.  (*Id.*)  Physical examination was unremarkable.  (*Id.*)  Dr. Rosen recommended that Plaintiff take Zoloft at bedtime and that she undergo additional neuropsychological and cognitive testing as well as postureography testing to fine-tune her balance instability treatment.  (*Id.* at 181.)  He also suggested that Plaintiff try a stimulant such as Ritalin.  (*Id.*)

Dr. Rosen saw Plaintiff again in April 2003.  (*Id.* at 168.)  He noted that Plaintiff had a history of chronic dizziness but had "some definite improvement" with ocular rehabilitation therapy.  (*Id.*)  Plaintiff still had some dizziness with rapid movements.  (*Id.*)  Dr. Rosen reported that computerized dynamic postureography completed in February 2003 confirmed vestibular dysfunction and visual preference abnormalities.  (*Id.*)  He recommended a retrial of vestibular therapy.  (*Id.*)

Plaintiff's final examination with Dr. Rosen was on January 8, 2004.  (*Id.* at 167.)  Dr. Rosen noted that Plaintiff "responded nicely" to visual rehabilitation therapies, though she still complained of dizziness.  (*Id.* at 167.)  He concluded that Plaintiff has right vestibulopathy and chronic vestibular syndrome manifesting itself as chronic complaints as well as visual disorientation.  (*Id.*)  He recommended Plaintiff undergo vestibular rehabilitation therapies.  (*Id.*)

### 4. *Dr. Allen Cohen - Board Certified Optometrist*

Dr. Allen Cohen examined Plaintiff on October 7, 2002 for complaints of dizziness with head movement. (*Id.* at 98.) Plaintiff reported that balance therapy offered only minimal improvement of these symptoms. (*Id.*) She also complained of photosensitivity, difficulty watching objects on television, difficulty scanning written material, and double vision when tilting her head. (*Id.*) Dr. Cohen concluded that Plaintiff presents with a vertical fixation disparity and poorly controlled fusion ranges. (*Id.*) He prescribed distance glassed with a prism diopter to neutralize fixation disparity and visual therapy to improve and expand fusion facility. (*Id.*)

### 5. *Robert Schissel, D.O.*[9]

On October 5, 2002, Dr. Robert Schissel filed a report with the New York State Department of Disability Assistance regarding care provided to Plaintiff from 1994 to 2002. (*Id.* at 131-32.) The report does not indicate how many times Plaintiff was seen by Dr. Schissel during this time period. (*Id.*) He reported that Plaintiff was well until March 2002 when she complained of dizziness and a sinus type pain. (*Id.* at 131.) She had sinusitis and headaches and was placed on Antivert for vertigo and headaches. (*Id.*) Although the sinusitis resolved, she was left with benign positional vertigo and "continued to manifest herself unable to walk." (*Id.* at 131-32.) He noted Dr. Mullins's work-up and that auditory and visual evoke response test

---

[9] Abbreviation for Doctor of Osteopathy. *Stedman's* at 535. Osteopathy is defined as any disease of the bone. *Id.* at 1284. It is "[a] school of medicine based upon a concept of the normal body as a vital machine capable, when in correct adjustment, of making its own remedies against infections and other toxic conditions; practitioners use the diagnostic and therapeutic measures of conventional medicine in addition to manipulative measures." *Id.*

supported a diagnosis of recurring vesiculitis[10] and labyrinthitis.[11]  (*Id.*)

### 6.  *Dr. Ray Haag-Orthopedic Surgeon*

Dr. Ray Haag, an orthopedic surgeon, examined Plaintiff on March 15, 2004, at the request of Dr. Schissel, for complaints of right knee pain following a fall.  (*Id.* at 204-05.) Plaintiff explained that she "falls a lot" because of her vestibular disorder.  (*Id.*)

### 7.  *Frank W. Telang, M.D.*

Dr. Frank W. Telang examined Plaintiff on July 19, 2004.  (*Id.* at 206.)  He noted Plaintiff's complaints of dizziness.  He stated that Plaintiff appeared "very tense" with "poor eye contact."  (*Id.*)  Dr. Telang treated Plaintiff for anxiety with Effexor.  (*Id.*)

## C.  *Medical Evidence/Non-Treating Physicians*

### 1.  *Dr. Bruce Nyfield - Consultive Psychologist*

Dr. Bruce Nyfield performed a consultative mental status examination of Plaintiff on March 5, 2003.  (*Id.* at 135-38.)  Dr. Nyfield concluded that Plaintiff can perform simple tasks independently but would have difficulty performing complex tasks either independently or with supervision and with dealing with moderate to high degrees of stress.  (*Id.* at 137.)  He reported that Plaintiff was experiencing anxiety, primarily due to her medical conditions, but that her emotional difficulties do not appear to primarily account for her difficulties functioning on a day-to-day basis.  (*Id.*)

On May 7, 2005, Dr. Nyfield conducted an adult organicity test, measuring, inter alia, Plaintiff's IQ, reading, vocabulary, and comprehension, to determine whether there had

---

[10]  Inflammation of a vesicle.  *Stedman's* at 1959.

[11]  Inflammation of the inner ear.  *Stedman's* at 957.

been any diminution in Plaintiff's cognitive functioning.  (*Id.* at 139.)  Plaintiff reported

problems with memory, concentration, and organization.  (*Id.*)  Upon testing, Plaintiff scored

primarily in the average range with no significant cognitive deficits.  (*Id.* at 141-42.)  Based on

this testing, Dr. Nyfield opined that Plaintiff could follow simple instructions and maintain

attention and concentration.  (*Id.* at 142.)  He also felt that Plaintiff could deal with low levels of

stress but would have difficulties performing complex tasks and dealing with moderate degrees

of stress.  (*Id.*)  Dr. Nyfield concluded that:

> [Plaintiff's] primary difficulties would appear to be in the medical
> realm where she is likely to have difficulty handling certain tasks
> due to her reported physical pain and medical conditions.
> However, I would defer to medical examination to make this
> determination.  With respect to purely psychiatric and cognitive
> functioning, the claimant's allegations do not appear to be
> consistent with the current evaluation.

(*Id.*)

### 2.    *Dr. Osvaldo Fulco - Board Certified Internist*

Dr. Osvaldo Fulco testified at the November 2004 hearing at the request of ALJ

Halpern.  (*Id.* at 217-20.)  Dr. Fulco never examined Plaintiff and his testimony was based solely

on reports of record.  Dr. Fulco testified that the record indicated that Plaintiff had vestibular

dysfunction which did not meet or equal any of the listings of impairment.  (*Id.* at 218-19.)  He

opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, that

she could stand and walk two hours in an eight-hour day with interruptions, and sit for six hours.

(*Id.* at 219.)  He advised that Plaintiff avoid working in hazardous situations such as in open

space and heights.  (*Id.*)  On cross-examination, Dr. Fulco testified that although there was

evidence of visual disorientation, he did not believe it would impact her exertional residual

functional capacity. (*Id.* at 220.) Similarly, he stated that although the record suggests that Plaintiff has some limitations in concentration, there were normal residual functional capacity evaluations by the treating physicians. (*Id.*)

**3.      *Dr. Anthony Buonocore, M.D.***

Dr. Anthony Buonocore, a physician employed by the New York State Office of Temporary and Disability Assistance, evaluated the record as it existed on February 5, 2003. (*Id.* at 134.) He never examined Plaintiff. Dr. Buonocore stated that Plaintiff "should be able to" stand and walk for six hours and lift/carry ten pounds frequently and 20 pounds occasionally. (*Id.*)

**4.      *Dr. W. Skranovski***

Dr. W. Skranovski, a physician, reviewed the file on May 27, 2003. (*Id.* at 144-161.) He never examined Plaintiff. He concluded that Plaintiff had no significant limitations in mental functioning. (*Id.* at 144-46.) Relying on Plaintiff's own statements, he also found that Plaintiff could travel alone, manage finances, socialize with others, follow instructions, and deal with authority figures. (*Id.* at 146.)

## *DISCUSSION*

**I.      *Standard of Review***

**A.      *Review of the ALJ's Decision***

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court may set aside a determination of the ALJ only if it "based upon

legal error or is not supported by substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d

Cir. 1999) (internal quotation marks and citation omitted). "Substantial evidence is 'more than a

mere scintilla,' and is 'such relevant evidence as [a] reasonable mind might accept as adequate to

support a conclusion.'" *Jasinski v. Barnhart,* 341 F.3d 182, 184 (2d Cir. 2003) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the findings of the

Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. §

405(g), and thus, the reviewing court does not decide the case de novo. *Halloran v. Barnhart*,

362 F.3d 28, 31 (2d Cir. 2004) (internal quotation marks and citation omitted).

### B.     *Eligibility for Disability Benefits*

To be eligible for disability benefits under the Social Security Act (the "SSA"), a

claimant must establish that he is unable "to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). The SSA further states that this impairment must be "of

such severity that [the claimant] is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

The SSA has promulgated regulations prescribing a five-step analysis for

evaluating disability claims. *See* 20 C.F.R. § 404.1520. This Circuit has described the

procedure as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental

> ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa*, 168 F.3d at 77 (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

## II.    Application of the Governing Law to the Present Facts

### A.    The ALJ's Decision

Applying the five-step analysis enumerated in 20 C.F.R. § 404.1520, the ALJ found that Plaintiff had satisfied the first two steps, to wit: (1) Plaintiff had not engaged in substantial gainful activity since March 1, 2002; and (2) Plaintiff had severe impairments related to her right peripheral vestibulopathy and vestibular syndrome. The ALJ concluded that Plaintiff did not meet the third step, however, because her impairments neither met nor equaled in severity any impairment in the Listing of Impairments, Appendix 1, Subpart P, Part 404 of the Regulations. Because the ALJ found that Plaintiff's ailments did not qualify as a per se disability under the listings, the ALJ went on to analyze the fourth factor, i.e., whether Plaintiff's impairments precluded performance of her past relevant work. The ALJ found that they did,

given that Plaintiff's past work required performance of complex tasks.

Once the ALJ determined that Plaintiff was not able to perform her past work, the ALJ analyzed the fifth and final step, viz. whether the Commissioner had established that there was other work Plaintiff could have performed.  In this regard, the ALJ found that despite Plaintiff's impairments,

> [Plaintiff] has the residual functional capacity to perform a wide range of unskilled, sedentary work; she can lift and carry twenty pounds occasionally, ten pounds frequently, sit six hours in an eight hour work day, stand and walk two hours in an eight hour work day with interruption and perform unskilled work.

(Tr. at 36.)  Thus, the ALJ found that Plaintiff was not disabled under the SSA.

## B.      *Plaintiff's Arguments*

Plaintiff concedes that she cannot meet section 207 of the Listings because her vestibular disorder does not present with evidence of progressive hearing loss.  Nonetheless, she asserts the following three arguments in support of her contention that the ALJ's decision should be overturned: (1) the record fails to contain any statements from Plaintiff's treating physicians as to her ability to perform sedentary work and the ALJ failed to develop the record in this regard; (2) the ALJ did not adequately consider Plaintiff's subjective complaints; and (3) the ALJ did not properly consider evidence of Plaintiff's right shoulder and neck pain, as substantiated by neurological surgeon Dr. Mullens.  The Court will address Plaintiff's arguments in turn.

## C.      *The Treating Physician Rule/The ALJ's Obligation to Develop Record*

Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); *see also Rosa,* 168 F.3d at 78-79.  The "treating physician rule" does not apply, however, when the treating physician's opinion is inconsistent with the other substantial evidence in the record, "such as the opinions of other medical experts."  *Halloran,* 362 F.3d at 32; *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).  When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion."  *Halloran,* 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).  These factors include: (1) the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors that are brought to the attention of the Social Security Administration that tend to support or contradict the opinion.  *Id.* § 404.1527(d)(2)(i-ii) & (d)(3-6); *see also Halloran*, 362 F.3d at 32.  Furthermore, when giving the treating physician's opinion less than controlling weight, the ALJ must provide the claimant with good reasons for doing so.  20 C.F.R. § 404.1527(d)(2).

In addition, it is clearly stated law in the Second Circuit that "while a treating physician's *retrospective* diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence."  *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (emphasis added); *see also Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician not given sufficient weight with regard to degenerative condition).

Finally, the ALJ may not reject the treating physician's conclusions based solely on inconsistency or lack of clear findings without first attempting to fill the gaps in the administrative record. *Rosa*, 168 F.3d at 79. "It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding,'" even if the claimant is represented by counsel. *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Butts v. Barhart*, 388 F.3d 377, 386 (2d Cir. 2004) ("'It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'") (quoting *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir. 2001)), *amended on other grounds on rehearing*, 416 F.3d 101 (2d Cir. 2005). Specifically, this duty requires the Commissioner to "seek additional evidence or clarification" from the claimant's treating sources when their reports "contain[ ] a conflict or ambiguity that must be resolved" or their reports are "inadequate for [the Commissioner] to determine whether [claimant] is disabled." 20 C.F.R. §§ 404.1512(e), (e)(1). The Commissioner "may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the claimant's] medical source." *Id.* § 404.1512(e)(1). The only exception to this requirement is where the Commissioner "know[s] from past experience that the source either cannot or will not provide the necessary findings." *Id.* § 404.1512(e)(2). If the information obtained from the claimant's medical sources is not sufficient to make a disability determination, or the Commissioner is unable to seek clarification from treating sources, the Commissioner will ask the claimant to attend one or more consultative evaluations. *Id.* § 404.1512(f).

**D.**     *Application to the Present Case*

**1.**     *Plaintiff's Functional Abilities*

Here, the ALJ concluded that although Plaintiff's impairments were severe and she was unable to perform her past work, Plaintiff had the residual functional capacity to perform a wide range of unskilled, sedentary work.  In making this determination, the ALJ stated as follows:

> The undersigned notes that no doctors of record, either treating or examining state [that plaintiff] is disabled and further notes that based on [Plaintiff's] testimony and medical evidence any symptoms she experiences do not last for more than ten to fifteen minutes.
>
> The undersigned Administrative Law Judge having fully evaluated the evidence of record gives substantial weight to the opinion of medical expert Dr. Fulco as it is consistent with the totality of the evidence.
>
> Therefore, the undersigned finds that the evidence considered as a whole establishes that the [Plaintiff] is limited in her ability to lift and carry heavy weight and stand and walk extensive periods of time and is limited in her ability to perform complex tasks, but she still has the residual functional capacity to perform a wide range of sedentary work.  The undersigned finds [Plaintiff] can lift and carry twenty pounds occasionally, ten pounds frequently, sit six hours in an eight hour work day, stand and walk two hours in an eight hour work day with interruption and has the mental abilities and aptitudes to perform at least unskilled work.

(Tr. at 35-36.)   He further summarily concluded that Plaintiff's "subjective allegations are not credible as they are not supported by the medical evidence."  (*Id.* at 36.)

As the ALJ recognized, it was the Commissioner's burden to demonstrate that Plaintiff retained the functional capacity to perform a range of unskilled sedentary work. According to the SSA, sedentary work generally involves lifting no more than ten pounds at a

time, and two hours of standing or walking and six hours of sitting in an eight hour work day. SSR 83-10 (Nov. 30, 1982). At the time of the ALJ's decision, the only medical evidence in the record that described Plaintiff's abilities to perform sedentary work came from Dr. Fulco and Dr. Buonocore, who both concluded that Plaintiff could perform sedentary work though neither examined Plaintiff, and Robert A. Schissel, D.O., who treated Plaintiff from February 2, 1994 through October 5, 2002 and noted on October 5, 2002 that Plaintiff "continued to manifest herself as unable to walk." (Tr. at 132.)[12] The ALJ's decision did not mention Dr. Buonocore or Dr. Schissel. However, the ALJ did afford substantial weight to Dr. Fulco's opinion, finding it consistent with the totality of the evidence.

In reaching his decision, the ALJ noted that there was no evidence from Plaintiff's treating physicians indicating that Plaintiff was disabled. In fact, other than Dr. Schissel's notation regarding Plaintiff's manifestations, there is no evidence in the record from Plaintiff's treating sources referencing her functional abilities at all. An absence of a specific finding regarding Plaintiff's abilities to perform sedentary work, however, is not necessarily inconsistent with a finding of disability. The treating physicians' failure to include this type of information in their reports does not mean such support does not exist; they might not have provided this information because they were not asked to do so at the time of their reports. As discussed above, the ALJ was obligated to ensure that the record was fully developed, which would include obtaining the treating physicians' assessments of Plaintiff's functioning. *See* 20 C.F.R. §§ 404.1512(e); *see also Rosa*, 168 F.3d at 80 ("Confronted with this situation, the ALJ

---

[12] As noted above, Dr. Schissel's records do not reveal how many times Plaintiff was treated during that time period. (Tr. at 131-32.)

should have taken steps directing Rosa to ask Dr. Ergas to supplement his findings with additional information."); *Schaal*, 134 F.3d at 505 *(*"[I]f the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the doctor] *sua sponte*."). While the regulations give the Commissioner the discretion to decline to seek "additional evidence or clarification from a medical source when [the Commissioner] know[s] from past experience that the source either cannot or will not provide the necessary findings," 20 C.F.R. § 404.1512(e)(2), the Commissioner has not alleged in her brief that this was the reason that additional information was not sought from Plaintiff's treating sources. Absent a valid explanation as to why the ALJ failed to seek out the diagnostic findings it required, the Court is not satisfied that the ALJ fulfilled his affirmative obligation under the Social Security regulations and Second Circuit jurisprudence.

In addition, the ALJ accorded substantial weight to Dr. Fulco's testimony, which was based solely on reports of record. As noted above, the regulations provide that an ALJ may only rely on a consultive *examination* when the Commissioner is unable to obtain the information from the treating sources. 20 C.F.R. § 404.1512(f). There is no evidence that that was the case here.

In sum, because the ALJ did not discharge his affirmative duty to fully develop the administrative record with regard to Plaintiff's functional abilities and failed to give a valid reason for not doing so, and further, because he relied on the opinion of a consultative doctor who never examined Plaintiff in reaching his conclusion, the Court finds that the ALJ committed legal error. *See Rosa*, 168 F.3d at 80 (holding that Commissioner committed legal error by foregoing opportunities to develop claimant's medical history and by rejecting treating

physician's medical assessment without fully developing factual record).  Accordingly, the Court

finds that the matter must be remanded to allow the ALJ to properly develop the record as to

Plaintiff's ability to perform unskilled sedentary work during the relevant time period.

**2.      *Plaintiff's Subjective Complaints***

Plaintiff argues that the ALJ failed to properly assess Plaintiff's subjective

complaints.  The Court agrees.

Social Security regulations require an ALJ to consider a claimant's subjective

testimony regarding her symptoms in determining whether she is disabled.  *See* 20 C.F.R. §

404.1529(a).  An ALJ should compare subjective testimony regarding the frequency and severity

of symptoms to objective medical evidence.  *Id.* § 404.1529(b).  If a claimant's subjective

evidence of pain is supported by objective medical evidence, it is entitled to "great weight."

*Simmons v. United States R.R. Retirement Bd.*, 982 F.2d 49, 56 (2d Cir. 1992).  However, if a

claimant's symptoms suggest a greater severity of impairment than can be demonstrated by the

objective medical evidence, additional factors must be considered.  *See* 20 C.F.R. §

404.1529(c)(3).  These include daily activities, the location, duration, frequency and intensity of

symptoms, the type, effectiveness and side effects of medication, and other treatment or

measures to relieve those symptoms.  *Id.*

In addition, SSR 96-7p provides in pertinent part:

It is not sufficient for the adjudicator to make a single, conclusory
statement that "the individual's allegations have been considered"
or that "the allegations are (or are not) credible."  It is also not
enough for the adjudicator simply to recite the factors that are
described in the regulations for evaluating symptoms. The
determination or decision must contain specific reasons for the
finding on credibility, supported by the evidence in the case
record, and must be sufficiently specific to make clear to the

20

> individual and to any subsequent reviewers the weight the
> adjudicator gave to the individual's statements and the reasons for
> that weight.

SSR 96-7p (July 2, 1996). Absent such findings, a remand is required. *See, e.g.*, *Schultz v. Astrue*, No. 04-CV-1369, 2008 WL 728925, at *12 (N.D.N.Y. Mar. 18, 2008).

Here, the ALJ found as follows:

> The undersigned [] has considered [Plaintiff's] subjective
> allegations of pain and functional limitation pursuant to regulations
> at 20 CFR 404.1529 and <u>Social</u> <u>Security</u> <u>Ruling</u> 96-7p.
>
> . . . .
>
> The claimant's subjective allegations are not credible as they are
> not supported by the medical evidence.

(Tr. at 34-36.)

The Court finds that notwithstanding the traditional deference given an ALJ with respect to evaluating credibility, *see Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984), the ALJ's decision to disregard Plaintiff's testimony in this case is not supported by substantial evidence. To the extent Plaintiff's reported subjective symptoms suggest a greater restriction of function than would be indicated by the medical evidence in the record, an analysis into Plaintiff's subjective complaints was required. For example, Plaintiff testified that she experiences five to six dizzy spells per day, each lasting ten to fifteen minutes at a time, which have caused her to fall down many times. (Tr. at 214-16.) If credited, these statements could possibly support a finding that Plaintiff is disabled. However, the ALJ failed to provide any analysis of Plaintiff's subjective complaints. Instead, he summarily stated that he considered the factors described in the regulations for evaluating symptoms and proffered no specific reasons for his findings, in contravention of SSR 96-7p. As a result, the Court is left

with no basis upon which to determine whether the appropriate legal standards were applied. The Court therefore remands this case for a determination of Plaintiff's credibility, which must contain specific findings based upon substantial evidence in a manner that enables effective review.

### 3. *Evidence of Right Shoulder and Neck Pain*

Plaintiff argues that the ALJ failed to consider the undisputed evidence of Plaintiff's right shoulder and neck pain, as substantiated by Dr. Mullens. A review of the record reveals that the ALJ's decision did not mention Dr. Mullen, a neurological surgeon who saw Plaintiff on four occasions in 2002. Similarly, Dr. Fulco did not refer to Dr. Mullens during his testimony about his review of the record. The ALJ's failure to even acknowledge the reports of Dr. Mullen violated his obligation to "'always give good reasons in [his] . . . decision for the weight [to be given to the] treating source's opinion.'" *Halloran*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(d)(2)). Accordingly, on remand, the ALJ shall specifically address Dr. Mullens' findings.

## III. *The Matter is Remanded*

Courts have declined to remand if the record shows that a finding of disability is compelled and only a calculation of benefits remains. *Medina v. Apfel*, No. 00 CIV. 3940, 2001 WL 1488284, at *4 (S.D.N.Y. Nov. 21, 2001). Conversely, if the record would permit a conclusion by the Commissioner that the plaintiff is not disabled, the appropriate remedy is to remand for further proceedings." *Id.* On this record, the Court cannot conclude whether Plaintiff had the ability to perform sedentary work during the relevant time period. Accordingly, the case is remanded to allow the ALJ to reweigh the evidence, developing the record as may be

needed.  *See Pratts*, 94 F.3d at 39 ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.  Remand is particularly appropriate where, as here, we are unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision.") (internal citations and quotation marks omitted).  Upon remand, the ALJ shall set forth his findings with particularity so that the Court may adequately review the record.

## CONCLUSION

For all of the reasons stated above, the Commissioner's motion for judgment on the pleadings is **DENIED** and Plaintiff's motion is **GRANTED** to the extent this case is remanded for further administrative proceedings consistent with this opinion.  The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated:   Central Islip, New York
         May 29, 2008

        _____/s_____
        Denis R. Hurley
        United States District Judge